# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
       **Plaintiff,**

    **v.**                         **Case No. 10-CR-40**

**PABLO MADRIGAL-OCHOA**
        **Defendant.**

## DECISION AND ORDER

The government charged defendant Pablo Madrigal-Ochoa with possessing ammunition as a felon, contrary to 18 U.S.C. § 922(g)(1). Defendant moved to suppress evidence seized from his residence pursuant to a search warrant – in particular, the shotgun shells forming the basis for his indictment, arguing that the warrant was not supported by probable cause. He also sought the suppression, as fruit of the unlawful search, of a statement he gave law enforcement during the execution of the warrant.

The magistrate judge handling pre-trial proceedings in this case reviewed the warrant application and concluded that it supplied probable cause for issuance of the warrant. In the alternative, he found that the executing officers were entitled to rely in good faith on the warrant. He therefore recommended that the motion be denied. Defendant objects, requiring me to review the matter de novo. <u>See</u> Fed. R. Crim. P. 59(b)(3).

## I. FACTS

The search warrant for defendant's residence issued on the application of City of Racine Police Investigator Theodore Schlitz. Where, as here, the applying officer's affidavit is the only evidence presented to the warrant-issuing judge, the warrant must stand or fall solely on the

contents of the affidavit. <u>United States v. Koerth</u>, 312 F.3d 862, 866 (7th Cir. 2002) (citing <u>United States v. Roth</u>, 391 F.2d 507, 509 (7th Cir. 1967)).

Schlitz indicated that he was investigating an attempted homicide that occurred on October 2, 2009, at 7:20 p.m. at 3310 6th Avenue, Racine, the residence of Brian and Emilie Berthelsen. (Schlitz Aff. [R. 9-1] ¶ 2.) Schlitz averred that he learned that on October 2, 2009, at about 11:25 a.m., a shooting took place in the area of 13th Street and South Memorial Drive, Racine, in which "L.R." received a grazing bullet wound to the head.[1]  Investigation of this shooting revealed that the suspects were four male Hispanics in a grey Jeep. (<u>Id.</u> ¶ 3.)  At about 7:20 p.m. that day, Officers Comstock, Riegelman and Riemer were at the St. Mary's Hospital emergency room when a person with a gunshot wound to the face was brought in by two other males.  The victim was identified as B.A., d.o.b. 1993, and the parties who drove him as J.R., d.o.b. 1994, and T.K., d.o.b. 1995.  (<u>Id.</u> ¶ 4.)  Officers Comstock and Riegelman located J.R. and T.K. in the lobby of the emergency room, and both had blood on their clothing. (<u>Id.</u> ¶ 5.)  T.K. led Officer Comstock outside to the parking lot to a grey Jeep, and T.K. stated that this was the vehicle they used to drive B.A. to the hospital.  T.K. opened the rear door of the Jeep, and Comstock observed a pool of blood on the seat and a towel covered with blood. (<u>Id.</u> ¶ 6.)

Schlitz averred that Investigator Spaulding interviewed another minor, D.A., in reference to the shooting of B.A.  D.A. stated that T.K. was handling a .357 revolver that belonged to Brian Berthelsen when the gun fired, striking B.A. in the face.  (<u>Id.</u> ¶ 7.)

---

[1]Many of the individuals involved in this case are minors.  In his affidavit, Schlitz used full names and dates of birth.  However, in this decision I will, consistent with this district's ECF policies, use initials and birth-years only.

2

On October 3, 2009, Schlitz interviewed Brian Berthelsen, who stated that he was present when B.A. was shot in his home. Mr. Berthelsen denied having possession of any weapons, but stated that he removed the weapon used in the shooting from his home and later turned it over to a person he knew as "Little Wicked." Mr. Berthelsen positively identified "Little Wicked" as Pablo Madrigal-Ochoa through a photograph. Mr. Berthlesen also stated that he removed from his home a cellular phone belonging to J.R., and that this phone along with his cell phone were at his mother's house, where his vehicle was located. (Id. ¶ 8.)

Investigator Spaulding interviewed Emilie Berthelsen, who stated she was present in the home when B.A. was shot. Ms. Berthelsen stated that the weapon used to shoot B.A. had been in her home for approximately one week and belonged to her husband, Brian Berthelsen. Ms. Berthelsen stated that she believed Mr. Berthelsen placed the weapon used in the shooting into a bag and removed it from the home. She stated that Mr. Berthelsen later made a phone call from his mother's home, where they had gone after the shooting. Ms. Berthelsen stated that Mr. Berthelsen later told her he had turned the gun over to "Little Wicked," whom she knew to be named Pablo. Ms. Berthelsen identified a photo of Pablo Madrigal as the person she knew as "Little Wicked." (Id. ¶ 9.)

Investigator Schlitz averred that he learned from Racine police and state Department of Transportation and Department of Corrections records that Pablo Madrigal-Ochoa resides at 2114 Romayne Avenue in the City of Racine, and that Pablo Madrigal-Ochoa is a felon, having been convicted of felony theft. (Id. ¶ 10.) Investigator Vanko personally observed the dwelling at 2114 Romayne and described it as a single story dwelling of frame construction with tan brick and black siding on the south face with white siding on the sides and the numbers 2114 on the south face of the building. (Id. ¶ 12.)

3

Based on this information, on October 3, 2009, Schlitz sought – and a Racine County Circuit Court Judge issued – a warrant for 2114 Romayne Ave. for any cellular phones belonging to the Berthelsens, defendant or J.R., and any firearms or firearm paraphernalia. (Id. ¶ 15.)[2] Officers executed the warrant the same day, and defendant allegedly stated during the search that the only thing officers would find was some shotgun shells. (R. 15 at 2.)

## II. DISCUSSION

The court employs a sequential, two-step test in determining whether to suppress evidence obtained pursuant to an allegedly defective search warrant. See Koerth, 312 F.3d at 866. The court first decides whether there is "substantial evidence" in the record supporting the issuing judge's probable cause determination. See, e.g., United States v. Sims, 551 F.3d 640, 644 (7th Cir. 2008); United States v. Lloyd, 71 F.3d 1256, 1262 (7th Cir. 1995). If not, the court asks whether the officer could "have reasonably believed that the facts set forth in the affidavit were sufficient to support a magistrate's finding of probable cause." Koerth, 312 F.3d at 866 (citing United States v. Leon, 468 U.S. 897, 920-24 (1984)).

### A.    Probable Cause

#### 1.    Applicable Legal Standard

Probable cause is established when, based on the totality of the circumstances, the affidavit sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime. United States v. Farmer, 543 F.3d 363, 377 (7th Cir. 2008); United States v. Peck, 317 F.3d 754, 756 (7th Cir. 2003). The Supreme Court has explained that:

_____

[2]Schlitz also sought a warrant for Mr. Berthelsen's mother's home, but that is not at issue here and I do not discuss it further.

4

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

Illinois v. Gates, 462 U.S. 213, 238 (1983).

When the affidavit includes information supplied by informants, the court considers a variety of factors, including the extent to which the police corroborated the informants' statements; the degree to which the informants acquired knowledge of the events through first-hand observation; the amount of detail provided; and the interval between the date of the events described and the officer's application for the warrant. United States v. Garcia, 528 F.3d 481, 486 (7th Cir.), cert. denied, 129 S. Ct. 422 (2008). A deficiency in one factor may be compensated for by a strong showing in another or by some other indication of reliability. United States v. Dismuke, 593 F.3d 582, 587 (7th Cir. 2010). Ultimately, the reviewing court should give the issuing judge's determination of probable cause considerable weight and resolve doubtful cases in favor of upholding the warrant. United States v. Quintanilla, 218 F.3d 674, 677 (7th Cir. 2000).

### 2. Analysis

The police learned that B.A. had been shot at the Berthelsen residence on October 2, 2009. Officers present at the hospital spoke to T.K., who showed the officers the bloody Jeep he and J.R. used to convey B.A. to the hospital. Investigator Spaulding interviewed D.A., who stated that T.K. was handling a .357 revolver that belonged to Brian Berthelsen when the gun fired, striking B.A. in the face. The following day, Schlitz interviewed Brian Berthelsen, who admitted that he was present when B.A. was shot in his home. He further admitted that he gave the gun to a person he knew as "Little Wicked" but identified as defendant through a

5

photograph. Investigator Spaulding interviewed Emilie Berthelsen, who also admitted being present when B.A. was shot in her home. Ms. Berthelsen stated that the weapon used to shoot B.A. belonged to her husband, that Mr. Berthelsen removed the gun from the home after the shooting, and that he later told her he had turned the gun over to "Little Wicked," whom she knew to be named Pablo. Ms. Berthelsen also identified "Little Wicked" as defendant from a photograph. The police then learned defendant's address from public records and on October 3, 2009 applied for a warrant to try to find the gun used in the previous day's shooting.

The police relied on recent, first-hand information, corroborated in key respects by multiple sources. Most significantly, both Mr. and Ms. Berthelsen admitted that on October 2 B.A. had been shot in their home, with Mr. Berthelsen's gun, apparently by another juvenile. Both Mr. and Mr. Berthelsen advised the police that Mr. Berthelsen removed the gun from the house and turned it over to defendant; both identified defendant from photographs; and both spoke against their own penal interests. See United States v. Mitten, 592 F.3d 767, 774 (7th Cir. 2010) (indicating that statements against penal interest "'carry their own indicia of credibility – sufficient at least to support a finding of probable cause to search'") (quoting United States v. Harris, 403 U.S. 573, 583-84 (1971)).

Although the affidavit supplies no direct connection between the gun and defendant's residence, warrants may be issued even in the absence of direct evidence linking criminal objects to a particular site. E.g., United States v. Lamon, 930 F.2d 1183, 1188 (7th Cir. 1991). The issuing judge is entitled to draw reasonable inferences about where evidence is likely to be kept based on the nature of the evidence and the type of offense, id., and courts have acknowledged that possessors of firearms are likely to keep them in their homes, see, e.g., United States v. Mayes, No. 06-CR-314, 2007 WL 486601, at *5 (E.D. Wis. Feb. 12, 2007)

6

(upholding search warrant where the witness did not see the suspect with the gun inside his home, and collecting cases holding that it is reasonable to assume that individuals who have guns keep them in their homes); United States v. Williams, No. 2:05CR381, 2006 WL 3052313, at *6 (W.D. Pa. Oct. 23, 2006) (collecting cases permitting searches for firearms even in the absence of direct evidence linking the firearms to the property searched); United States v. Maneti, 781 F. Supp. 169, 177 (W.D.N.Y. 1991) ("In the case of firearms, courts have held that a reasonable inference of where one would likely keep such evidence is at home."); see also United States v. Sleet, 54 F.3d 303, 306 (7th Cir. 1995) (upholding search of robbery suspect's apartment for the fruits and instrumentalities of the robbery, despite the absence of any direct evidence linking the crime to that location).

Finally, even if it might be reasonable to assume that defendant would want to get rid of a gun used in a shooting, the police obtained and executed the warrant the day after the shooting, when it was still reasonably likely that the firearm would be present. Cf. United States v. Person, 427 F. Supp. 2d 894, 902 (D. Minn. 2006) (upholding warrant where controlled drug transaction occurred within 72 hours of warrant application and the warrant was executed on the same day it issued, despite the disposable nature of drug evidence).[3] For these reasons, and those stated by the magistrate judge, I find that substantial evidence supports the decision to issue the warrant.

### 3. Defendant's Objections

In his objections to the magistrate judge's recommendation, defendant ably points out

---

[3] Cf. United States v. Harju, 466 F.3d 602, 608 (7th Cir. 2006) ("Here, by contrast, only three weeks had elapsed since the gun had been seen in Mr. Harju's possession on his property, and, unlike small amounts of drugs or cash, the gun was not likely to have been sold (or consumed) during that period of time.").

7

the shortcomings in the affidavit. Nevertheless, given the "great deference" due the issuing judge's probable cause determination, see United States v. Billian, 600 F.3d 791, 792 (7th Cir. 2010), I must reject his arguments.

### a. Adequacy of the Information Supplied

Defendant first attacks the adequacy of the information in the affidavit. Defendant notes that Schlitz did not indicate that, in his experience, persons involved in the receipt of a firearm used in a shooting often retain possession of the firearm in their residence. This is true, but as noted above, courts are permitted to draw reasonable inferences, and judges have regularly inferred that a person in possession of a firearm will keep it in his home. See, e.g., Maneti, 781 F. Supp. at 177-78 (citing United States v. Anderson, 851 F.2d 727, 729 (4th Cir. 1988); United States v. Hatfield, 599 F.2d 759, 762 (6th Cir. 1979); United States v. Steeves, 525 F.2d 33, 38 (8th Cir. 1975); United States v. Rahn, 511 F.2d 290, 293 (10th Cir. 1975)).

Defendant notes that involvement in ongoing criminal activity supports the notion that evidence will be found in the suspect's residence, see United States v. Watts, 535 F.3d 650, 656 (7th Cir.), cert. denied, 129 S. Ct. 475 (2008), but contends that the crime at issue here was not of that type. This argument seems to assume that Berthelsen gave defendant the gun to get rid of it rather than for safe-keeping. The issuing judge could reasonably conclude the latter. See United States v. Hubbard, No. CR. 04-118, 2005 WL 757861, at *2 (D. Me. Feb. 9, 2005) (explaining that possession of firearms is likely to be an ongoing activity, and that the "defendant's residence is a secure operational base for the conduct of the crime of possession of a firearm by a felon, which makes the passage of time less significant"). In any event, the search warrant in this case was executed less than a day after the shooting, making it reasonable to believe that the gun may still be there even if defendant intended to get rid of it

8

at some point.

Defendant notes the absence of any evidence that he was seen entering his home after the alleged transfer or was seen carrying into his house a bag like the one Emilie Berthelsen said her husband used to convey the gun. Such evidence would have been helpful, but again, a judge is allowed to draw reasonable inferences from the information he is given; it is not unreasonable to believe that defendant would, after receiving the gun from Berthelsen, return to his home.

Defendant also notes the absence of evidence in the affidavit concerning the distance between Brian Berthelsen's home, Berthelsen's mother's home (from which Berthelsen may have contacted defendant about the gun), and defendant's home. However, the affidavit indicates that all three locations are within the City of Racine, close enough to make it reasonable to believe that defendant could, after taking possession of the gun, return home. This is not a case where the suspect received contraband in New York on Monday night, and the officers sought to search his home in California for that contraband on Tuesday morning.

Finally, defendant notes that the items identified in the search warrant – cell phones and firearms – are easily exchanged or sold, absent positive evidence of an intent to retain them. However, courts have noted that firearms, unlike drugs or other contraband, are durable goods useful to those who possess them for long periods of time. See, e.g., United States v. Singer, 943 F.2d 758, 763 (7th Cir. 1991). Further, defendant's argument again rests on the assumption that Berthelsen transferred the gun with instructions to dispose of it, rather than to hold it until things blew over. True, the affidavit provides no definitive evidence either way, but it did not have to. As the magistrate judge stated, a warrant application need not answer all the questions; probable cause need not be based on evidence sufficient to support a

9

conviction, nor even a showing that the officer's belief as to the location of evidence is more likely true than false.  See United States v. Carmel, 548 F.3d 571, 575-76 (7th Cir. 2008).

### b. Reliability of Brian Berthelsen

Defendant's second line of attack centers on Brian Berthelsen's reliability, and Schlitz's failure to do more to corroborate Berthelsen's statements.  As defendant concedes, Berthelsen was not a confidential informant or anonymous tipster.  "[A] magistrate in the exercise of sound judgment is entitled to give greater weight to a tip from a known informant, who can be held responsible should he be found to have given misleading information to police officers, and thus has an incentive to provide truthful information to the detectives."  Koerth, 312 F.3d at 871. Further, as noted above, by conceding that one minor shot another with his gun, in his home, and that he then attempted to get rid of the gun, Berthelsen arguably made statements against his penal interest, which also enhances his credibility.  See Mitten, 592 F.3d at 774.

Defendant argues that Berthelsen gave no details supporting the notion that the gun he gave defendant ended up in defendant's home.  For the reasons set forth above, the judge was permitted to infer that the gun may be found in defendant's home, despite the lack of direct evidence.  Berthelsen did state that he gave the gun to defendant, and this statement is corroborated by his wife.  Defendant questions the value of Ms. Berthelsen's admission as corroboration, but the issuing judge could find significant an incriminating statement from Berthelsen's own wife.  Defendant notes the absence of evidence that Mr. Berthelsen previously provided information leading to arrests or prosecutions, but that sort of information is more important when the affiant relies on an unnamed CI rather than a known citizen.  See, e.g., United States v. Hanhardt, 157 F. Supp. 2d 978, 990 (N.D. Ill. 2001) (noting, in case involving named and unnamed informants, the officer's averment "that the confidential

10

informants have provided reliable information in the past, some of them for a number of years, and that such information has been used in other cases and to support other determinations of probable cause").

Further, defendant ignores the corroboration provided by other sources – the officers who observed B.A. and spoke to T.K. at the hospital, and D.A.'s statement to Investigator Spaulding that T.K. shot B.A. with Berthelsen's gun. See United States v. Ventresca, 380 U.S. 102, 111 (1965) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number."). While this evidence does not directly relate to the presence of the gun in defendant's house, it does corroborate Berthelsen's story about what happened before he gave the gun to defendant.

Finally, defendant notes that Berthelsen did not appear before the issuing judge, which would have allowed an evaluation of his demeanor and sincerity. But given the other factors discussed above, I cannot conclude that this defeats a finding of probable cause. See, e.g., Mayes, 2007 WL 486601, at *3 (finding that the fact that the named witness did not personally appear before the issuing judge did not, given the other circumstances, diminish her credibility).

### c.    Cases

Defendant notes that the magistrate judge cited just one case, Sleet, in support of the notion that a person who received a gun would keep it in his residence. Defendant contends that Sleet is distinguishable, but the case does stand for the proposition that a person in receipt of contraband may store it in his residence, and that a warrant may issue even in the absence of direct evidence linking the contraband to the residence. 54 F.3d at 306.

Defendant cites United States v. Barnard, 299 F.3d 90 (1st Cir. 2002), where the court

11

upheld a warrant based on a CI's statement that the defendant had a gun in his home, and the officer's averment that persons who owned guns generally kept them in their residences. Defendant notes the absence of similar statements in the affidavit here, but such evidence is not invariably required in order to uphold a warrant; as noted above, courts have sustained the common sense conclusion that the possessor of a gun is likely to keep it in his residence. See, e.g., Mayes, 2007 WL 486601, at *5. True, some of the cases refer to "individuals who own guns," United States v. Smith, 182 F.3d 473, 480 (6th Cir. 1999), but others involve more "casual" possessors. For example, the court in Rahn upheld the search of an ATF agent's home based on allegations that he converted firearms previously seized by the government, despite the absence of any direct evidence linking the firearms to his residence. 511 F.2d at 293. The court concluded: "Admittedly there are other places where the guns might have been stored; yet, we believe these facts and circumstances gave the magistrate probable cause to believe the weapons would be found as a result of the search of appellant's present residence." Id. at 294. I reach the same conclusion here.[4]

Defendant notes the importance of the right to privacy in the home, see United States v. Wilhelm, 80 F.3d 116, 120 (4th Cir. 1996), but he cites no case rejecting a warrant on similar facts. Thus, while the affidavit in this case could have been stronger, I conclude that it provided a substantial basis for the issuing judge to find probable cause.

---

[4]The defendant in Rahn also challenged the timeliness of the information, as the alleged thefts of the guns occurred in 1971, while the warrant issued in 1973. Id. at 292. The court rejected the argument based on evidence that the defendant used one of the guns for hunting in the interim period, and the defendant's statement that he expected the guns to appreciate in value. Id. at 292-93. It is true that the present affidavit contains no direct evidence that defendant used the gun or planned to hold it for a time before selling it. But here, the warrant issued the very day after the shooting and transfer, making the absence of such evidence less significant.

**B.      Good Faith**

Because the warrant is valid, it is not necessary to address the applicability of Leon. Nevertheless, I conclude in the alternative that the officers could have relied in good faith on the judge's decision to issue the warrant.

An officer's decision to seek a warrant is prima facie evidence that he acted in good faith. Koerth, 312 F.3d at 868. "A defendant can rebut the presumption of good faith only by showing that the judge issuing the warrant abandoned his/her detached and neutral role, the officers were dishonest or reckless in preparing the affidavit, or the warrant was so lacking in probable cause as to render the officer's belief in its existence entirely unreasonable." United States v. Otero, 495 F.3d 393, 398 (7th Cir. 2007).

Defendant does not argue that the issuing judge abandoned his proper role, or that Schlitz lied to the judge. Thus, he must show either that courts have clearly held that a materially similar affidavit previously failed to establish probable cause or that the affidavit is so plainly deficient that any reasonably well-trained officer would have known that it failed to establish probable cause. Koerth, 312 F.3d at 869.

Defendant cites no case rejecting a similar affidavit. Rather, he notes that Leon does not apply to "bare-bones" affidavits. See Wilhelm, 80 F.3d at 121-22. The instant application cannot be so described. As discussed above, Schlitz's affidavit contains more than "entirely conclusory allegations." See Dismuke, 593 F.3d at 588 (citing United States v. Curry, 538 F.3d 718, 729 (7th Cir. 2008)). Defendant faults Schlitz for rushing to obtain the warrant before gathering more information. But if Schlitz had waited, the inference that the gun remained in defendant's residence would grow weaker.

Under these circumstances, where the warrant was issued by a state circuit court judge

13

and the application later found adequate by a federal magistrate judge and federal district court judge, I cannot conclude that the executing officers should have known that the warrant was deficient. See Billian, 600 F.3d at 792-93 ("How could one say, as Leon requires for suppression, that any reasonable police officer must have known that the search warrant was deficient, when after an evidentiary hearing and ample time for reflection a federal judge found the warrant valid?").

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 14) is adopted, and defendant's motion to suppress (R. 8) is **DENIED**.[5]

Dated at Milwaukee, Wisconsin, this 27th day of May, 2009.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[5]As noted above, defendant also sought suppression of the statement he made during the execution of the warrant. Because the warrant is valid, and defendant makes no independent argument in support of suppressing the statement, this request must also be denied.